UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| [UNDER SEAL] | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| [UNDER SEAL] | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**

**DO NOT FILE WITH PACER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES and NEW YORK STATE, ex rel. MARK A. FAVORS | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No._____ |
| QIN MEDICAL P.C. and and DR. FENG QIN, M.D. | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS

AND NOW COMES Qui Tam Plaintiff / Relator Mark A. Favors (the "Relator"), by and through his attorneys, on behalf of the United States of America ("United States") and New York State, for his Complaint against Qin Medical P.C. ("Qin Medical") and Dr. Feng Qin, M.D. ("Dr. Qin") (collectively, "Defendants"), and alleges based upon direct and personal knowledge, as follows.

## PRELIMINARY STATEMENT

1.      This suit seeks to recover millions of dollars in damages sustained by the Medicare and Medicaid programs (the "Government Programs") as a result of the Defendants' fraudulent conduct in violation of the False Claims Act, 31 U.S.C. § 3729 (the "FCA") and New York Finance Law §§187-194.

2.      Dr. Qin is the Chief Executive Officer and founder of Qin Medical, a medical facility located in New York, New York.  As supported by documentation obtained by the Relator, Dr. Qin and Qin Medical have defrauded the Government Programs out of millions of dollars in the form of illegally obtained reimbursements for

surgical procedures that were medically unnecessary, falsely documented, and harmful to patients.

3.      Defendants provide vascular surgery services to patients with end-stage renal disease ("ESRD") who received dialysis. Two of the most common procedures performed by Defendants are fistulagrams (a radiological procedure in which dye is injected into the patient's vein or artery to visualize it) and angioplasties (in which wires and balloons are inserted into veins or arteries that have narrowed in order to restore the blood flow).  On information and belief, the vast majority of these patients were enrolled in the Government Programs.

4.      Pursuant to the applicable regulations, the Government Programs will only reimburse a provider for a fistulagram when the ESRD patient has certain "diagnostically specific and appropriate indications," and will only reimburse a provider for an angioplasty when there is "documentation supporting the presence of residual, hemodynamically significant stenosis, generally [greater than or equal to] 50 percent of the vessel diameter."

5.      As detailed below, the Relator has discovered that Defendants have routinely performed fistulagrams and angioplasties on ESRD patients who did not have the requisite symptoms or indications and improperly charged those procedures to the Government Programs for reimbursement.  In so doing, Defendants have systematically falsified patient records to reflect a supposed medical necessity for the procedures that are conducted when, in actuality, the radiological imagery of the procedures shows that no medical basis existed.

6.      Defendants' scheme is laid bare through the sheer frequency with which Qin Medical patients are treated.  During the period from November 2015 through April 2016, nearly every patient who came to the office for a "possible fistulagram" or "possible angioplasty" were in fact given a fistulagram or angioplasty.  Based upon Relator's observations, exceptions to this rule occurred only when another professional such as a radiologist who might question the decision to proceed was present during the evaluation. Depending on the month, approximately 75 to 90 percent of the patients evaluated for angiograms or fistulagrams were given these procedures.

7.      Dr. Qin performed these needless procedures (and falsely billed for them under the Government Programs) even when patients stated that they were experiencing no difficulties with their fistula and no problems with dialysis.  In the overwhelming majority of these cases, Dr. Qin proceeded to falsely reflect in billing records submitted under the Government Programs that the patients exhibited one or more instances of "venous blockage" or "stenosis" of greater than 50%, a requirement for reimbursement.

8.      Dr. Qin employs deceitful and immoral tactics to coerce his patients – many of whom are elderly immigrants – into agreeing to undergo these medically unnecessary procedures at an alarming frequency.  Indeed, Dr. Qin routinely schedules repeat procedures for his patients every three months, leading them to believe that failing to return will have dire consequences.  For example, Dr. Qin told patient R.J. that a fistulagram is something he must "regularly check like a car service, except it's more important than a car."

9.      To further ensure a constant patient flow, Qin Medical routinely waives patient co-payments, even where his patients are able to pay, yet fails to disclose such

waivers when submitting for reimbursement under the Government Programs.  As a further inducement to patients, Qin Medical often arranges for a limousine service to bring patients to and from the clinic so that a procedure can be performed.  These costs are submitted for reimbursement under the Government Programs even though they are incurred for the purposes of inducing patients to undergo a medically unnecessary procedure that would not qualify for reimbursement.

10.     Dr. Qin's fraudulent scheme has an Achilles Heel, however – the medical procedures that Qin Medical routinely submits for reimbursements are recorded on radiological imagery and stored in conjunction with each patient's file.  Thus, while Dr. Qin represents in his medical records that procedures were legitimately performed due to the existence of "greater than 50% stenosis" (often in multiple venous zones), the radiological imagery taken during those very same procedures flatly contradicts that statement in all but a handful of cases.

11.     To verify the overwhelming inference of fraud presented through the unusually high frequency of billed procedures and unethical tactics at Qin Medical, the Relator retained an expert to perform an independent comparison of the notations in Qin Medical patient files with the accompanying radiological imagery.  The expert concluded that in a shocking 89% of cases reviewed, the imagery showed no indication for treatment.  In other words, according to the expert, 89% of Defendants' patients did not need the procedures they were given, and certainly did not exhibit the "hemodynamically significant stenosis [of] 50 percent of the vessel diameter" that Qin Medical represented to the Government Programs was present.

12.    As a direct result of the egregious, illegal practices described herein, Dr. Qin and Qin Medical are among the highest recipients of Medicare funds among all vascular surgeons in New York.  In 2013, Qin Medical was reimbursed $1,481,535 under the Medicare program, placing Dr. Qin's practice second on the list of New York vascular surgery providers that year.  In 2014, Dr. Qin's reimbursement from Medicare grew to $2,006,820, placing him third on the list of vascular surgeons in New York.  On information and belief, Qin Medical received significantly greater than $2 million in Medicare reimbursements in 2015.

13.    Dr. Qin's fraudulent conduct is particularly egregious in light the fact that he previously agreed to pay a $150,000 penalty to the United States government in connection with substantially similar fraudulent conduct while he was an employee at a different vascular surgery clinic.  Despite entering into an Integrity Agreement with the United States that was designed to prevent improper billing practices, Dr. Qin and Qin Medical have significantly increased their fraudulent conduct, as described below.

14.    Indeed, not only has the Integrity Agreement not caused Dr. Qin to rein in his illegal behavior, the culture at Qin Medical has devolved into cavalier defiance of the rules.  On December 15, 2015 – mere months after signing the Integrity Agreement – Dr. Qin openly boasted to his billing assistant:  "And the monitoring by the feds, I know how to play Medicare's asses now."

15.    The Relator brings the present action to expose the rampant fraud perpetrated by Dr. Qin at Qin Medical, which costs the United States taxpayers millions of dollars each year while exposing unsuspecting patients to medically unnecessary and invasive medical procedures.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, relating to jurisdiction over matters arising under the laws of the Unites States, as well as 31 U.S.C. § 3732(a), relating to false claims act jurisdiction.  Further, this Court has jurisdiction to entertain a qui tam action.  The Relator is an "original source" who is authorized to maintain this action in the name of the United States as contemplated by the Civil False Claims Act, 31 U.S.C. § 3729-33.

17.     The Relator is similarly authorized to maintain this action in the name of the State of New York as an "original source" as defined in the New York False Claims Act (Finance Law § 188(7)).

18.     The Relator, through his counsel, has made voluntary disclosures to the United States Government prior to the filing of this lawsuit and has satisfied the requirements of 31 U.S.C. § 3730 by engaging in an interview with, and providing written disclosure of substantially all material evidence and information in Relator's possession to, the United States Attorney's Office for the Southern District of New York.

19.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) and 3732(a) because a substantial part of the events giving rise to the claims occurred in this district, and the Defendants transact business within this District.

## PARTIES

20.     Relator Mark A. Favors is an individual residing in Bronx, New York. Relator has personal knowledge of the allegations herein by virtue of his employment with one or more of the Defendants.

21.     Defendant Qin Medical P.C., a New York Professional Corporation, is a nephrology medical practice with its principal place of business located at 123 Lafayette Street, 6th Floor, New York, New York. a citizen and resident of the State of New

22.     Defendant Dr. Feng Qin, M.D., a citizen and resident of the State of New York, is the Chief Executive Officer of Qin Medical.

## **BACKGROUND**

23.     Qin Medical is a nephrology medical practice established in 2011, which, in or about 2012, began to operate an office-based surgery facility located at 123 Lafayette St., 6th Floor, New York, NY 10013.  Subsequently, in or about September 15, 2015, Qin Medical also began to operate an office-based surgery facility located at 327 Beach 19th St., 9th Floor, Far Rockaway, NY 11691.

24.     Feng Qin, M.D. is a vascular surgeon who graduated from the Medical Center of Fudan University, Shanghai, China in 1985.  Thereafter, Dr. Qin completed residencies at St, Vincent's Catholic Medical Centers at Manhattan (2004) and University of South Alabama School of Medicine (2007).  He also completed fellowships at Shanghai Second Medical University (1988) and North Shore University Hospital—Long Island Jewish Medical Center (2009).  According to his online bio, Dr. Qin speaks the Mandarin, Cantonese, Shanghaiese, and Fujian dialects of the Chinese language.  Dr. Qin holds a New York State Medical License active through 2017.

25.     Dr. Qin is the Chief Executive Officer of Qin Medical.  Through Qin Medical, Dr. Qin provides vascular surgery services to patients with end-stage renal failure disease who receive dialysis and require well-functioning vascular access in order

for them to be effectively dialyzed.  The two most common procedures performed by Dr.

Qin are fistulagrams and angioplasties.

26.     On information and belief, in Dr. Qin performed 223 angioplasties in

2012, 456 angioplasties in 2013, and 636 angioplasties in 2014, amounts that rate as

"high volume" in New York and nationally.

27.     On information and belief, the vast majority of the patients treated by Dr.

Qin are enrolled in one or more of the Government Programs.

28.     On information and belief, Defendants are contractors vis-à-vis the United

States and State of New York relating to the Government Programs.  By their

participation in the Government Programs, Defendants have written contracts with the

United States and State of New York in connection with which Defendants provide

covered services in accordance with the applicable regulations and receive payment as

consideration in return.

**B.     Prior Action**

29.     On April 30, 2015, the United States of America initiated a Complaint in

Intervention relating to a civil action (U.S. District Court, Southern District of New York,

No. 12 Civ. 2327 (LLS)) previously filed against Dr. Qin and the group with which he

was then associated to recover damages sustained by, and penalties owed to, the United

States as the result of the defendants, including Dr. Qin, having submitted false claims to

the government.

30.     Strikingly similar to the facts here, that civil action alleged that the

defendants, including Dr. Qin, routinely performed fistulagrams on ESRD patients who

did not have the requisite symptoms or indications.  It was further alleged that, from time

to time, Dr. Qin performed angioplasties on certain patients where the patient information
and records did not fulfill the controlling criteria.

31.     Based on these allegations, the United States sought treble damages,
penalties, and costs from the defendants, including Dr. Qin, pursuant to The False Claims
Act, 31 U.S.C. §§ 3729 *et seq.*

**C.     Stipulation and Order of Settlement and Dismissal**

32.     By Stipulation and Order of Settlement and Dismissal filed in Case No. 12
Civ. 2327 (LLS) on May 4, 2015 (the "Settlement"), the civil action filed against Dr. Qin
and the other defendants was resolved and settled.  In accordance with the terms and
provisions of the Stipulation and Order, including payment of certain sums by Dr. Qin,
Dr. Qin was released for Covered Conduct (defined in the Stipulation and Order)
occurring between April 2010 and April 2012.

33.     Under the Settlement, any liability to the United States for conduct *other
than* the Covered Conduct was specifically reserved and not released.

**D.     Integrity Agreement**

34.     Effective April 29, 2015, for a three year term, Dr. Qin and Qin Medical
entered into an Integrity Agreement with the Office of Inspector General of the United
States Department of Health and Human Services to promote compliance with the
statutes, regulations, program requirements, and written directives of Medicare,
Medicaid, and all other Federal health care programs.  The Integrity Agreement, for
example, includes procedures for evaluating and analyzing the medical necessity and
appropriateness of AV dialysis access interventions and dialysis access dysfunction

diagnostic tests performed or order by Dr. Qin and the required notices and approval process if Dr. Qin opens a new location.

35.     As detailed herein, Dr. Qin and Qin Medical have violated and continue to violate the terms of the Integrity Agreement.

**E.     The Relator**

36.     The Relator currently works as a registered nurse in the operating room and endovascular suite of SOHO Vascular Surgery in New York City, a facility that is owned and operated by Dr. Qin and Qin Medical.  Working under the direct supervision of Dr. Qin, the Relator is responsible for monitoring patients during surgical and endovascular procedures.  He also performs admission intakes, counsels patients on the recovery process and discharge instructions.  He is responsible for charting/documenting observations, medications, vital signs, symptoms, social history, family and medical history and physical assessments for all patients.

37.     At various points during his tenure with Dr. Qin, the Relator also filled in for radiology staff.  For example, from October 2012 through January 2015, he was tasked with ensuring that all the radiology images from each procedure were saved by backing them up on the system and personally saving and storing them on DVDs. Starting in 2014, the storage converted from physical DVDs to a remote type system in which images were transmitted via telephone lines to the remote server.  This allows images to be viewed on computers in the office and remotely.

38.     From January 2015 through December 2015, a radiology technician performed these duties.  However, the Relator resumed this responsibility in January 2016 when the technician left the office for maternity reasons.

39.     Thus, the Relator has for years observed Defendants' improper conduct
with respect to the treatment of patients and the submission of false claims for
reimbursement by the Medicare and Medicaid programs.

### THE APPLICABLE STATUTES

**A.  THE FALSE CLAIMS ACT**

40.     The FCA is the Federal government's chief weapon in combating waste,
fraud, and abuse of public funds. In relevant part, it provides for treble damages liability
and civil penalties for any entity which:

> (i)      knowingly presents, or causes to be presented, a false or fraudulent
>          claim for payment or approval, 31 U.S.C. § 3729(a)(1) (2000) and,
>          as amended, 31 U.S.C. § 3729(a)(1)(A);
>
> (ii)     knowingly makes, uses, or causes to be made or used, a false
>          record or statement material to a false or fraudulent claim, id. §
>          3729(a)(1)(B); or
>
> (iii)    conspires to defraud the Government by getting a false or
>          fraudulent claim allowed or paid, *id.* § 3729(a)(3) (1986), and, as
>          amended, 31 U.S.C. § 3729(a)(1)(C).

41.     An entity "knowingly" presents or causes to be presented a false statement
where it "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of
the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or
falsity of the information."  The FCA does not require proof of a specific intent to
defraud. 31 U.S.C. § 3729(b)(1).

42.     In addition, the FCA provides that a person "may bring a civil action for a
violation of section 3729 for the person and for the United States Government." 31
U.S.C. § 3730(b)(1).

**B.  THE NEW YORK FALSE CLAIMS ACT**

43. New York's equivalent to the False Claim Act similarly prohibits presenting and

causing to be presented false claims, making or causing to be made false records material to a false claim, and conspiring to do either.  New York Finance Law §§ 187-194.

### C.  THE GOVERNMENT PROGRAMS

44.      Pursuant to Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,* the federal Medicare program was established in 1965 to provide health insurance for elderly and disabled persons.  In 1972, Congress expanded Medicare to provide insurance coverage for patients with ESRD, regardless of their age.  *See* Pub. L. No. 92-603, § 2991, 86 Stat. 1329, 1463-64 (1972) (codified at 42 U.S.C. § 1395c).

45.      Under the Medicare statute, "[n]otwithstanding any other provisions of this subchapter, no payment may be made under [Medicare] part A or part B for any expenses incurred for items or services. . . (B) in the case of items or services . . . , which are *not reasonable and necessary for the prevention of illness."* § 1395y(a)(1) (emphasis added).  In submitting a Medicare reimbursement form, a healthcare provider implicitly certifies compliance with § 1395y(a)(1), including § 1395y(a)(1)(B).

46.      Deciding what is "reasonable and necessary" under § 1395y(a)(1)(B) is delegated in the first instance to the Secretary of Health and Human Resources (HHS), and HHS may decide whether or not to reimburse for certain types of treatments by promulgating national coverage determinations.  HHS contracts with Medicare Part B carriers to provide coverage for out-of-hospital medical services, and such carriers may create more refined guidelines, called "local coverage determinations."  These determinations set regional coverage rules that govern in the absence of or as an adjunct to a national policy.

a. **The Local Coverage Determination**

47.     Local Coverage Determination L31865, *Dialysis Access Maintenance* (the LCD) was issued by Medicare Part B carrier CGS Administrators, LLC for services performed on or after January 1, 2013.  This LCD was applicable in New York throughout the time that Dr. Qin performed the procedures that are the subject of this complaint.  The LCD discusses various procedures that vascular surgeons typically perform on ESRD patients and sets forth rules governing when Medicare will reimburse providers for such procedures in the states governed by the LCD.

48.     The "Limitations" section of the LCD states generally that "[c]laims will not be paid if documentation in the medical record (*e.g.,* procedure report) does not verify that the services described by the submitted CPT codes were provided and/or were not medically necessary. Medicare does not pay for services that are screening in nature or that are not providing clinically relevant information."

49.     With respect to the need for fistulagrams, the LCD states that "[t]ypically, the clinical examination provides adequate information to determine whether there is hemodynamically dialysis shunt dysfunction," and lists several "clinical findings [that] are considered diagnostically specific and appropriate indications to initiate therapies to re-establish physiologically appropriate flow in the dialysis fistula," including "elevated venous pressure in the AV dialysis access," "elevated venous/arterial ratio (static venous pressure ration—above 40%,)" and "prolonged bleeding following needle removal." LCD at 3-4.  The LCD further notes that "[i]f stenosis is suspected clinically, typically a diagnostic study is required to determine the level(s) of disease and to formulate a plan for treatment.  This is most commonly accomplished with a fistulagram (CPT code

36147)."

50.      The LCD's Limitation section warns that "[w]hen diagnostic non-invasive vascular studies are performed to evaluate an AV access on a routine basis in the absence of signs and symptoms, the services are considered monitoring, and are not separately covered by Medicare.  In the absence of clinical findings suggesting the need to re-establish appropriate flow in a dialysis fistula, it is seldom reasonable and necessary to perform diagnostic angiography or sonographic confirmatory studies as part of the decision to treat (*i.e.*, CPT codes 75710, 75820, 93990)."

51.      As for angioplasty, the LCD provides that "[a]ngioplasty of vessels not documented to be stenosed significantly by angiography or ultrasound will be considered not medically necessary . . . . The placement of stent(s) in a vessel(s) for which there has been no objective symptoms or limitations of function is considered to be preventive, and therefore not covered by Medicare.  Placement of a stent (CPT codes 37205-37206) and the associated radiological supervision and interpretation service (CPT code 75960) in an AV access when there are no objective symptoms or limitation of function are considered preventative and therefore not covered."

52.      The LCD further notes that angioplasty "of the AV dialysis access and/or afferent and efferent vessels is not necessary for all poorly functioning AV dialysis accesses.  Coverage will be considered if there is documentation supporting the presence of residual, hemodynamically significant stenosis, generally >/50 percent of the vessel diameter.  There must be clear documentation of the site and extent of any hemodynamically significant stenosis.  This documentation may be subjected to medical necessity review."

53.     LCD 31865 is not something new that was just sprung on practitioners in this area in 2013.  It was preceded by Local Coverage Determination L30737, also entitled *Dialysis Access Maintenance*, now "RETIRED," that was identical in all relevant aspects to L31865.

54.     Submitting a reimbursement request to Medicare for medical procedures that does not comply with the Local Coverage Directive (LCD) constitutes a false claim actionable under § 3729(a)(1)(A) of the FCA.

55.     Creating medical records for medical procedures that do not comply with the LCD that are intended to form the basis of a reimbursement request to Medicare constitutes the creation of a false record or statement material to a false claim actionable under § 3729(a)(1)(B) of the FCA.

56.     Collaborating with others to create medical records for medical procedures that do not comply with the LCD that are intended to form the basis of a reimbursement request to Medicare or to submit such a reimbursement request constitutes conspiracy under § 3729(a)(1)(C) of the FCA.

57.     The Medicare program consists of four parts: Parts A, B, C, and D.  The medical services at issue in this case are covered under Part B.  The fundamental requirement for reimbursement eligibility under Medicare Part B is that the services provided must be reasonable and necessary.  *See* 42 U.S.C. § 1395y(a)(1)(A).

58.     Claims for medically unnecessary treatment are actionable under the FCA.

**c.      Medicare's Co-Payment Requirement**

59.     Medicare Part B typically pays 80% of a "reasonable charge" for medical services rendered. 42 U.S.C. § 1395(a)(1).  Beneficiaries are expected to make up the remaining 20%.

60.     Requiring beneficiaries to pay for part of the services they receive discourages patients from accepting services they do not need.

61.     When a provider routinely waives Medicare's copayment, they are misstating their charges. *See* OIG Special Fraud Alert. 59 F.R. 242 (December 19, 1994). The *OIG's* alert explains:  "If a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item."

62.     Billing under such a scheme constitutes submission of a false claim under the False Claims Act because a provider who routinely waives Medicare copayments or deductibles is misstating its actual charge for services and doing so results in false claims.

**c.      The Medicaid Program**

63.     Medicaid is a public assistance program providing for payment of medical expenses for low-income patients.  Funding for Medicaid is shared between the federal government and state governments.

**d.      Defendants' Certifications to the Government Programs**

64.     In order to participate in Medicare as a group clinic, Qin Medical is

required to complete an application.  On information and belief, as part of the application process, Qin Medical completed the following certification:

> I agree to abide by the Medicare Laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti- kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare...
>
> ...I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.
>
> *See* CMS, Form CMS 855B.

65.    Dr. Qin is required to complete a similar certification for participation in Medicare as an individual physician.  *See* CMS, Form CMS 855I.

66.    Both Dr. Qin and Qin Medical are required to complete similar certifications for participation in the Medicaid program.

67.    Those submitting insurance claims to Medicare also certify that the services rendered are "medically indicated and necessary for the health of the patient;" that the information on the claims form is true, accurate and complete; and that the provider "understand[s] that because payment and satisfaction of the claim will be from Federal and State funds, and any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State laws." CMS, Form CMS 1500.  Further, Form 1500 contains the following statement: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." *Id*.

68.     On information and belief, Dr. Qin and Qin Medical made these certifications to the Government Programs at the time of their initial application to become providers and regularly recertify this information as a condition of their continued participation.

## DEFENDANTS' FRAUDULENT CONDUCT

69.     Defendants routinely and systematically performed medical procedures, including fistulagrams and angioplasties, that were medically unnecessary, and then abused the Medicare and/or Medicaid system to receive unwarranted payments for those procedures, resulting in fraudulently obtained payments.  Defendants' conduct in this regard was done with actual knowledge or in deliberate ignorance or in reckless indifference to and of the true facts.

70.     At all times relevant to this Complaint, Defendants' invasive and unnecessary medical procedures have compromised (and continue to compromise) patient safety.

71.     In particular, beginning in 2012 and continuing until the date of this Complaint, Defendants performed fistulagrams and angioplasties, and billed one or more of the Government Programs for those procedures, without medical justification.

72.     Despite the procedures specified in the Integrity Agreement, Dr. Qin has developed a system to circumvent the spirit, intent and letter of that agreement.  In a nutshell, he documents false information in his patient procedure notes.

73.      As alleged above, from November 2015 through March 2016, a shockingly high percentage of the patients scheduled for a "possible fistulagram" or "possible angiogram" actually had one or the other procedures performed.  Review by an

independent expert of a random sample of cases identified by Defendants as all involving

patients with more than 50% stenosis in multiple venous zones shows that 89% of those

patients were in need of no procedure whatsoever.

74.     Defendant's conduct has caused substantial injury and damage to the

United States and State of New York in an amount to be proven at trial.

**COUNT ONE**
**VIOLATION OF THE FALSE CALIMS ACT**
**(31 U.S.C. § 3729)**

75.     Relator incorporates by reference Paragraphs 1 through 74 of this

Complaint as if fully set forth herein.

76.     This is a Civil Action brought by Relator on behalf of the United States

against the Defendants pursuant to the False Claims Act, 31 U.S.C. §3729, et seq.

77.     Defendants knowingly presented or caused to be presented false and

fraudulent claims for payment pursuant to their participation in the Government

Programs under the False Claims Act.

78.     Defendants have, as described above, submitted numerous false claims for

payment to the United States, in violation of the False Claims Act, for unnecessary

medical services and/or the unnecessary use of devices generally covered by the

Government Programs.

79.     Defendants have, upon information and belief, submitted numerous false

claims for payment to the United States (via the Government Programs), in violation of

the False Claims Act, by routinely and systematically waiving the co-payment

requirement for patients.

80.     Defendants have, upon information and belief, knowingly made, used or caused to be made, or used, false and otherwise inaccurate records or statements during the process of billing the Government Programs in violation of the False Claims Act.

## COUNT TWO
## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT
## (FINANCE LAW §§ 187-194)

81.     Relator incorporates by reference Paragraphs 1 through 80 of this Complaint as if fully set forth herein.

82.     This is a Civil Action brought by Relator on behalf of the State of New York against the Defendants pursuant to the New York False Claims Act (Finance Law §§ 187-194) (the "New York False Claims Act").

83.     Defendants knowingly presented or caused to be presented false and fraudulent claims for payment pursuant to their participation in the Government Programs under the New York False Claims Act.

84.     Defendants have, as described above, submitted numerous false claims for payment to the United States, in violation of the New York False Claims Act, for unnecessary medical services and/or the unnecessary use of devices generally covered by the Government Programs.

85.     Defendants have, upon information and belief, submitted numerous false claims for payment to the United States (via the Government Programs), in violation of the New York False Claims Act, by routinely and systematically waiving the co-payment requirement for patients.

86.     Defendants have, upon information and belief, knowingly made, used or caused to be made, or used, false and otherwise inaccurate records or statements during

the process of billing the Government Programs in violation of the New York False

Claims Act.

WHEREFORE, the Relator prays for judgment against the Defendants as follows:

a)       Defendants be ordered to cease and desist from submitting and/or causing

the submission of any more false claims and/or otherwise violating 31 U.S.C. §§ 3729, et

seq.;

b)       That judgment be entered in for the United States and against Defendants

in the amount of each and every false or fraudulent claim and so multiplied as provided

by the Civil False Claims Act, including, but not limited to, statutory penalties, court

costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this

lawsuit;

c)       That Relator be awarded the maximum amount for his service allowed

pursuant to the False Claims Act as cited and referenced herein;

d)       Defendants be ordered to cease and desist from submitting and/or causing

the submission of any more false claims and/or otherwise violating the New York False

Claims Act;

e)       That judgment be granted for the State of New York and against

Defendants in the amount of each and every false or fraudulent claim and so multiplied as

provided by the New York False Claims Act, for any costs, including, but not limited to,

court cost, expert fees, and all attorneys' fees incurred by Relators in the prosecution of

this lawsuit;

f)      That Relator be awarded the maximum amount allowed pursuant to the

New York False Claims Act as cited and referenced herein; and

g)      That Relator, the United States, and the State of New York be granted any

other relief to which they are entitled, whether by law or equity.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator, on

behalf of himself and the United States, hereby demands a jury trial on all issues.

Dated: June 20, 2016

Respectfully submitted,

CHELNEY LAW GROUP PLLC

By: _____

Konstantin Chelney (KC1013)
535 Fifth Avenue, 4th Floor
New York, New York 10017
(212) 653-0022

*Counsel for Qui Tam Plaintiff*